In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1017

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

*Plaintiff-Appellee,*

*v.*

AUTOZONE, INCORPORATED,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 07-CV-1154—**John A. Gorman**, *Magistrate Judge.*

ARGUED SEPTEMBER 13, 2012—DECIDED FEBRUARY 15, 2013

Before MANION, SYKES, and HAMILTON, *Circuit Judges.*

MANION, *Circuit Judge.* The Equal Employment Opportunity Commission filed this employment discrimination case on behalf of John Shepherd, a former employee of AutoZone, and alleged that AutoZone had violated the Americans with Disabilities Act. Shepherd had a back injury that was aggravated by mopping floors, and he claimed that AutoZone required him to mop the store

floors despite his requests for relief. Among other claims, the EEOC alleged that AutoZone had failed to accommodate Shepherd's disability. The magistrate judge hearing this case initially ruled for AutoZone on summary judgment on this accommodation claim, but we reversed that ruling on appeal. On remand, a jury returned a verdict in Shepherd's favor. The magistrate judge then approved $100,000 in compensatory damages, $200,000 in punitive damages, $115,000 in back pay, an injunction on AutoZone's anti-discrimination practices, and the EEOC's motion to vacate a prior award of costs to AutoZone from the first trial. AutoZone appeals the verdict and remedies. We affirm on all issues except for a provision in the injunction, which we remand for further proceedings.

## I. Facts

Shepherd started working for AutoZone, Inc. ("AutoZone") in 1998. He initially worked as a sales clerk—a non-supervisory position—but was promoted to parts sales manager a year later. Shepherd's store manager called him a good salesman who could "sell ice cubes to an Eskimo," and noted that customers would specifically ask for Shepherd's assistance. As a result, Shepherd averaged the highest sales per customer among the employees at his store in 2003. Although Shepherd received several reprimands at work, he won the AutoZone Extra Miler award, which AutoZone characterized as a "prestigious honor," and AutoZone even asked Shepherd to train new employees.

But Shepherd suffered from a chronic back injury. In 1996, Shepherd had been permanently injured while working for a different employer, and he sought help from his neurologist, Dr. Marc Katchen. Dr. Katchen determined that Shepherd had impairments to his trapezius and rhomboid muscles of the upper-left side of his back, a degenerative-disc disease of the cervical vertebrae, and a herniated disc of the cervical vertebrae. As a result, Shepherd could rotate his torso, but repetitive twisting aggravated his condition and caused "flare-ups," which brought on severe pain in his neck and back.

About 80% of Shepherd's work at AutoZone was devoted to sales and customer service, and these activities did not affect his health. However, soon after starting work at AutoZone, Shepherd began to experience severe flare-ups that caused his back and neck to swell, and would cause pain with the slightest of movements. He had to use hot baths, ice, and a TENS (Transcutaneous Electrical Nerve Stimulation) unit that sent electrical currents through his skin to control the pain. Dr. Katchen determined that these flare-ups were caused by the repetitive motions involved in mopping AutoZone's floors, which was one of Shepherd's job requirements.

Shepherd asked his store manager, Larry Gray, if he could be released from mopping, and Gray informally allowed Shepherd to perform other tasks instead. But when the district manager, Steven Smith, found out that Shepherd was no longer mopping the floors, he directed Gray to have Shepherd resume mopping. Gray complied.

After Shepherd transferred to another AutoZone store in Smith's district, he again sought to avoid mopping the floors. The store manager, Terry Wilmot, was willing to accommodate Shepherd's back injury, but when one of Shepherd's coworkers complained about Shepherd's special treatment, Smith again insisted that Shepherd should mop the floors. Although Wilmot allowed Shepherd to avoid mopping duties when Smith was not around, Smith demoted Wilmot in July 2002, and replaced him with a new store manager, Steven Thompson.

The testimony at trial revealed two distinct versions of Shepherd's job requirements while he worked for Thompson. Thompson and Smith testified that they were willing to accommodate Shepherd's condition. They stated that whenever Shepherd was scheduled to mop the floors, he was allowed to delegate the mopping task to other AutoZone employees because he was a parts sales manager. Shepherd, however, testified that Thompson and Smith still required him to mop the floors. He stated that he had sent a myriad of health and medical forms—some produced in conjunction with Dr. Katchen—to AutoZone officials, but he never received an accommodation.

In March 2003, Shepherd took a medical leave of absence because his mopping duties had caused his condition to worsen. He returned to work in April, and although Thompson and Smith testified that Shepherd had been free to delegate his mopping duties, Shepherd testified that he was still compelled to mop the floors. As a result, he suffered from flare-ups four or five times

a week and was unable to perform basic tasks of his daily routine. Shepherd's wife, Susan, had to help Shepherd get dressed, wash his body, and engage in other activities around the house. Shepherd began to suffer from depression and Dr. Katchen prescribed an antidepressant.

Shepherd continued to seek an accommodation that would allow him to stop mopping the floors. Shepherd contacted a number of corporate officials at AutoZone and was quite insistent that he needed an accommodation. Among other corporate officials, Shepherd frequently contacted Jackie Moore, the lead disability coordinator who worked at AutoZone's corporate benefits department in Memphis, Tennessee.

On September 12, 2003, Shepherd was wringing out a mop when he felt a sharp pain. He tried to continue his work, but the pain persisted, and he suffered a disabling flare-up that left him unable to return to work for the rest of the year. Three days after this flare-up, Smith sent Shepherd a written letter that relieved Shepherd of his mopping duties because of his back condition. Over the next few months, Shepherd received extensive treatments from Dr. Katchen, including heat treatment, physical therapy, medications, deep tissue massage, ultrasound, antidepressants, and sleep inducers. When Shepherd tried to return to work in January 2004, he learned that AutoZone would not allow him to return. Instead, AutoZone kept Shepherd on involuntary medical leave until February 2005, when it terminated his employment with AutoZone.

Throughout this process, Shepherd had filed multiple charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"), and in June 2007, the EEOC brought an action against AutoZone under the Americans with Disabilities Act ("ADA"). The EEOC's complaint alleged that AutoZone had failed to accommodate Shepherd's disability during his employment from March to September 2003. Additionally, it alleged that AutoZone had retaliated against Shepherd and had failed to accommodate his disability when it refused to allow Shepherd to return to work in January 2004 and later terminated his employment. The EEOC and AutoZone agreed to submit to the jurisdiction of a magistrate judge, and AutoZone moved for summary judgment on all claims.

The magistrate judge granted summary judgment for AutoZone on the March to September 2003 accommodation claim, but allowed the involuntary-leave and termination claims to go to trial. A jury found that Shepherd had not been qualified to perform his job in January 2004 and therefore ruled in AutoZone's favor on these claims. The EEOC appealed the magistrate judge's grant of summary judgment on the accommodation claim, but not the jury's verdict. On appeal, we reversed the magistrate judge's grant of summary judgment and remanded for further proceedings. *EEOC v. AutoZone, Inc.*, 630 F.3d 635, 644-45 (7th Cir. 2010).

In preparation for the second trial, AutoZone moved to exclude Dr. Katchen's testimony because he had not produced a written report, but the magistrate judge

denied this motion. The magistrate judge then presided over a jury trial on the accommodation claim, and the jury returned a verdict in favor of the EEOC. The jury ruled that Shepherd had been qualified to perform his job between March and September 2003, and awarded $115,000 in back pay, $100,000 in compensatory damages, and $500,000 in punitive damages. After trial, the magistrate judge remitted the punitive damages to $200,000 to bring the compensatory and punitive damages within the ADA's $300,000 statutory cap. The magistrate judge also granted a motion from the EEOC to impose an injunction on AutoZone and granted a motion from the EEOC to vacate an award of costs to AutoZone from the first trial.

## II. Discussion

AutoZone appeals the magistrate judge's decision on three grounds. First, AutoZone argues that the first trial precluded the second jury from reaching its verdict against AutoZone. Second, if we find that the second jury was not precluded from reaching its verdict, AutoZone argues for a new trial because it contends that the EEOC had Dr. Katchen testify without submitting a written report. Third, if we uphold the verdict of the second trial, AutoZone argues that we should alter the remedies resulting from it. Specifically, AutoZone challenges the compensatory damages, the punitive damages, the injunction, and the award of costs. We address each of AutoZone's arguments in turn.

## A. Issue Preclusion

AutoZone argues that issue preclusion prevented the second jury from reaching its verdict in favor of the EEOC. We review a district court's ruling on issue preclusion de novo. *Dexia Crédit Local v. Rogan*, 629 F.3d 612, 628 (7th Cir. 2010).

Issue preclusion contains four elements and requires that:

> (1) the issue sought to be precluded must be the same as that involved in the prior litigation, (2) the issue must have been actually litigated, (3) the determination of the issue must have been essential to the final judgment, and (4) the party against whom estoppel is invoked must be fully represented in the prior action.

*Matrix IV, Inc. v. Am. Nat'l Bank & Trust Co. of Chi.*, 649 F.3d 539, 547 (7th Cir. 2011) (quoting *H-D Mich., Inc. v. Top Quality Serv., Inc.*, 496 F.3d 755, 760 (7th Cir. 2007)). Issue preclusion is an affirmative defense and the party asserting it has the burden of proof. *Simpsen v. Nickel*, 450 F.3d 303, 306 (7th Cir. 2006).

The first trial addressed the EEOC's involuntary-leave and termination claims. To prevail in that trial, the EEOC needed to establish that (1) Shepherd was a qualified individual with a disability; (2) AutoZone was aware of Shepherd's disability; and (3) AutoZone failed to reasonably accommodate Shepherd's disability. *See Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 545 (7th Cir. 2008). AutoZone had argued that mopping was an essential

function that Shepherd was unable to perform, and that he was therefore not a qualified individual under the first element. The first jury then returned a verdict declaring that Shepherd was not qualified to perform his job in January 2004. But the second jury returned a verdict stating that Shepherd was qualified to perform his job in March through September 2003. AutoZone moved for judgment as a matter of law on the ground that the first trial precluded the second jury from reaching its verdict. The magistrate judge denied AutoZone's motion, and AutoZone now seeks to have this ruling reversed.

Even though both juries addressed the same element in the EEOC's case, the two trials dealt with different time periods. The verdict form for the first jury asked, "In January 2004, was Mr. Shepherd qualified to perform his job?" The first jury answered "No." The second jury, however, returned a verdict that pertained only to "the period March 2003 to September 12, 2003." The verdict form for the second jury asked, "Was John Shepherd qualified to perform his job during this period?" The second jury answered "Yes."

AutoZone recognizes that the two juries analyzed two different time periods, but it argues that Shepherd's condition remained constant throughout his employment at AutoZone because his back injury was permanent. But this argument ignores Shepherd's September 12, 2003, flare-up that caused him to take a lengthy leave of absence. Even AutoZone treated Shepherd differently after his disabling flare-up. Before that flare-up, AutoZone

purportedly expressed a desire to accommodate Shepherd's disability. Three days after his disabling flareup, AutoZone sent Shepherd a letter indicating that Shepherd "should not be performing [certain tasks], such as, scrubbing, buffing, and sweeping." Ultimately, AutoZone concluded that Shepherd could no longer perform his job and terminated his employment.

Just as AutoZone treated Shepherd's health differently after the September 12, 2003, flare-up, we too recognize that Shepherd's health was not the same after his disabling flare-up. Because the two juries considered different issues, AutoZone is unable to meet the first element of issue preclusion.[1] We therefore conclude that the magistrate judge correctly denied AutoZone's motion for judgment as a matter of law.

## B. Expert Testimony

Because issue preclusion did not prevent the second jury from reaching its verdict, we must now address AutoZone's motion for a new trial. AutoZone moved for a new trial because Dr. Katchen testified without submitting a written report, but the magistrate judge denied this motion. We review a district court's discovery determinations and denials of motions for new trials for an abuse of discretion. *Miksis v. Howard*, 106

---

[1] Because we affirm on this basis, we need not reach the EEOC's arguments that AutoZone forfeited this issue or that the issue was barred by laches.

F.3d 754, 758 (7th Cir. 1997) (discovery determinations); *Ross v. Black & Decker, Inc.*, 977 F.2d 1178, 1182 (7th Cir. 1992) (motions for new trials).

An expert witness must submit a written report "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B). However, a treating physician can provide an expert opinion without submitting a written report if the physician's opinion was formed during the course of the physician's treatment, and not in preparation for litigation. *See Meyers v. Nat'l R.R. Passenger Corp.*, 619 F.3d 729, 734-35 (7th Cir. 2010) (holding that doctors who had testified about the causation of the defendant's injuries specifically for litigation purposes were required to submit expert reports).

Dr. Katchen testified about his treatment of Shepherd's back condition. In his testimony, he discussed his role as Shepherd's treating physician and reviewed and explained various medical records that he had produced while treating Shepherd. Additionally, Shepherd had been Dr. Katchen's patient since 1997—well in advance of this litigation. Because Dr. Katchen's testimony focused on his treatment of Shepherd and his medical opinions were not formed for this litigation, the magistrate judge did not abuse his discretion in permitting Dr. Katchen to testify. For the same reason, the magistrate judge did not abuse his discretion in denying AutoZone's motion for a new trial on this basis.

## C. Remedies

Because we do not require the magistrate judge to hold a new trial, we must now address AutoZone's arguments about the remedies that resulted from that trial. AutoZone raises issues relating to (1) the compensatory damages; (2) the punitive damages; (3) the injunction; and (4) the award of costs.

## 1. Compensatory Damages

AutoZone first argues that the compensatory damages are excessive and should be remitted from $100,000 to $10,000. The jury awarded compensatory damages of $100,000 for the "physical, emotional and/or mental pain [Shepherd] experienced . . . as a result of AutoZone's failure to provide him with reasonable accommodation." AutoZone moved for remittitur, but the magistrate judge denied this request and kept compensatory damages at $100,000. Because the district court is in a better position than we are to make findings of credibility, consider the weight of evidence, and make inferences from that evidence, we give a district court's findings great weight. *Merriweather v. Family Dollar Stores of Ind., Inc.*, 103 F.3d 576, 580 (7th Cir. 1996). We therefore review a district court's order refusing remittitur of compensatory damages for an abuse of discretion. *G. G. v. Grindle*, 665 F.3d 795, 798 (7th Cir. 2011).

To determine whether an award of compensatory damages is excessive, we consider whether the damages awarded (1) were monstrously excessive; (2) had no

rational connection between the award and the evidence; and (3) were roughly comparable to awards made in similar cases. *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 483-84 (7th Cir. 2003); *Merriweather*, 103 F.3d at 580. *But see EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1285 n.13 (7th Cir. 1995) (suggesting that the first factor is a vague standard of review and should be folded into the second factor—"neither monstrous nor irrational").

We agree with the magistrate judge that the EEOC provided sufficient evidence to support the award of compensatory damages. First, Shepherd testified about the symptoms of his back condition and the details of his disabling September 12, 2003, back injury. Additionally, evidence from Shepherd's wife provided a detailed account of the effect that Shepherd's injuries had on his daily life while working at AutoZone. Finally, Dr. Katchen testified in great detail about his diagnosis and treatment of Shepherd's myofascial pain. This evidence provides a basis for concluding that the compensatory damages were not monstrously excessive, but were instead rationally connected to Shepherd's pain.

Additionally, the magistrate judge accurately observed that the compensatory damages in this case are approximately the same value as the compensatory damages awarded in comparable cases. *See, e.g.*, *Deloughery v. City of Chi.*, 422 F.3d 611, 613-14, 619-21 (7th Cir. 2005) (upholding an award of $175,000 in compensatory damages for an employee's emotional distress after her employer failed to promote her); *Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 713-15 (7th Cir. 2004) (upholding

an award of $100,000 in compensatory damages for an employee's "mental and physical ailments," for which a "jury could have reasonably concluded that awards in the range of $50,000 to $150,000 were necessary"); *Lampley*, 340 F.3d at 484-85 (upholding an award of $75,000 in compensatory damages when the employee's improper termination had lingering negative effects on the employee's mental state).

In fact, Shepherd's case is more extreme than some of these cases because Shepherd experienced near-daily pain that left him incapable of performing common activities, such as putting on his clothes and taking a shower. We have recognized that cases that include even the slightest "physical element" are often associated with more substantial compensatory-damages awards. *See Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 410 (7th Cir. 2010) (awarding $250,000 in compensatory damages because the employee had been concerned about "his safety and that of his patients"); *see also Naeem v. McKesson Drug Co.*, 444 F.3d 593, 598-600, 611-12 (7th Cir. 2006) (upholding an award of $240,000 in damages for pain and suffering under Illinois state law when the plaintiff suffered physical symptoms of anxiety during a complicated pregnancy); *Farfaras v. Citizens Bank & Trust of Chi.*, 433 F.3d 558, 560-64, 566-67 (7th Cir. 2006) (upholding an award of $200,000 in compensatory damages because the employee had been repeatedly and inappropriately touched and intimidated, among other forms of sexual harassment).

We conclude that all three factors used to determine whether compensatory damages are excessive weigh in

favor of the EEOC. The magistrate judge therefore did not abuse his discretion when he upheld the award of $100,000 in compensatory damages for Shepherd's pain and suffering.

## 2. Punitive Damages

The jury awarded $500,000 in punitive damages against AutoZone, but the magistrate judge reduced the punitive damages to $200,000 to comply with a statutory cap. *See* 42 U.S.C. § 1981a(b)(3)(D). AutoZone first asks us to vacate the punitive damages for insufficient evidence. If we decline to do so, AutoZone alternatively asks us to remit punitive damages under the Due Process Clause to no more than $10,000.

### i. Sufficiency of Evidence

We review the denial of a motion for judgment as a matter of law de novo. *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011). We must "examine the evidence presented, combined with any reasonably drawn inferences, and determine whether that evidence sufficiently supports the verdict when viewed in the light most favorable to the non-moving party," here, the EEOC. *Tincher v. Wal-Mart Stores, Inc.*, 118 F.3d 1125, 1129 (7th Cir. 1997); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149-51 (2000). Although we examine the sufficiency of the evidence, we do "not make credibility determinations or weigh the evidence." *Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011).

Instead, we reverse the verdict only if no rational jury could have found for the prevailing party. *Bogan v. City of Chi.*, 644 F.3d 563, 572 (7th Cir. 2011).

Punitive damages are available to the EEOC if it can demonstrate that AutoZone engaged in intentional discrimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). In *Kolstad v. American Dental Ass'n*, the Supreme Court established a three-part framework to determine whether punitive damages are proper under § 1981a. 527 U.S. 526, 533-46 (1999). First, the plaintiff must show that the employer acted with "malice" or "reckless indifference" toward the employee's rights under federal law. *Id.* at 533-39. A plaintiff "may satisfy this element by demonstrating that the relevant individuals knew of or were familiar with the anti-discrimination laws" but nonetheless ignored them or lied about their discriminatory activities. *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 857-58 (7th Cir. 2001). The plaintiff has the burden of proving "malice" or "reckless indifference" by a preponderance of the evidence. *See generally Price Waterhouse v. Hopkins*, 490 U.S. 228, 253 (1989). Second, the plaintiff must establish a basis for imputing liability to the employer based on agency principles. *Kolstad*, 527 U.S. at 539-44. Employers can be liable for the acts of their agents when the employer authorizes or ratifies a discriminatory act, the employer recklessly employs an unfit agent, or the agent commits a discriminatory act while "employed in a managerial capacity and . . . acting in the scope of employment." *Id.* at 542-43 (quoting Restatement (Second) of Agency

§ 217 C (1957)). Third, when a plaintiff imputes liability to the employer through an agent working in a "managerial capacity . . . in the scope of employment," the employer has the opportunity to avoid liability for punitive damages by showing that it engaged in good-faith efforts to implement an anti-discrimination policy. *Id.* at 544-46. This is a fact-intensive analysis, and "although the implementation of a written or formal anti-discrimination policy is relevant to evaluating an employer's good faith efforts . . . , it is not sufficient in and of itself to insulate an employer from a punitive damages award." *Bruso*, 239 F.3d at 858.

The three *Kolstad* guideposts support the punitive-damages award. First, a rational jury could have found that AutoZone acted with "reckless indifference" to Shepherd's federal employment rights. AutoZone stipulated that Thompson, Smith, and Moore had all received ADA training.

Furthermore, Teresa James, the benefits manager for AutoZone and Moore's supervisor, testified about AutoZone's established procedure for handling employees' accommodation requests. If an AutoZone employee made an accommodation request, the benefits department would obtain the employee's medical documentation, such as a physician's report, then coordinate with AutoZone's legal department to "ensure that there is a consensus on what the request is." The benefits department would then review the physical demands of the employee's position and coordinate with a human resources manager in the field to deter-

mine whether AutoZone could accommodate the employee's disability.

But the jury received evidence suggesting that this procedure was not properly followed in Shepherd's case. Moore, AutoZone's lead disability coordinator, testified that she knew Shepherd and remembered her conversations with him. Her testimony suggested that she was dismissive of Shepherd's requests for an accommodation, and indicated that other AutoZone employees were frustrated with Shepherd because he "had a penchant for corresponding to various people within the AutoZone corporation and at various departments."

Even if Moore had been frustrated by Shepherd's demeanor, she also testified that she had been aware of his medical restrictions. Indeed, she knew that he "had medical conditions because that would have been within the realm of why I would have worked with him in the first place, to try . . . to provide reasonable accommodation to return to work considering those instances." Shepherd testified that he had told Moore that "for whatever reason Steve Smith was telling Steve Thompson that he wasn't to accommodate my restrictions as far as mopping, and that all I was asking for pretty much was that accommodation . . . ."

Although Moore was aware of Shepherd's situation, her testimony revealed that she did not address Shepherd's disability through AutoZone's typical procedures. Instead, when asked whether she could "recall having considered any potential accommodations that would address [Shepherd's] limitation," Moore answered:

"I think it is something that I would have addressed. Not always, though. That would not always, of course, be a deciding factor because we considered other things like staffing levels. . . . So, you know, it's something that we would have certainly talked about." Moore testified about what she hypothetically "would" do in Shepherd's case—not what she actually did. When Moore was asked whether Shepherd's "[in]ability to twist his upper body would not have been a deciding factor by itself" in determining whether AutoZone could make an accommodation for Shepherd, she responded that "it wouldn't have been a single deciding factor of whether or not . . . we would say, you know, No, we don't have anything for you to do." Again, Moore talked about making accommodations for Shepherd as a hypothetical.

Moore eventually did take concrete action to address Shepherd's situation. She coordinated with Smith and instructed him to type up a letter for Shepherd. This letter informed Shepherd that he should not engage in any activities that affected his medical condition. But this letter was dated September 15, 2003—three days after Shepherd suffered his disabling back injury, and the day that Dr. Katchen placed Shepherd on medical leave. A jury could easily conclude that this letter was delivered too late to affect Shepherd's work requirements. A jury might even conclude that this letter was nothing more than AutoZone's attempt to cover up its prior failure to accommodate Shepherd's disability.

AutoZone argues that its mistakes—if any—were not the result of reckless disregard for Shepherd's rights, but

were caused by mere negligence, which is not sufficient to support punitive damages under *Gile v. United Airlines, Inc.*, 213 F.3d 365 (7th Cir. 2000). In *Gile*, a woman with various psychological disorders, Cheryl Gile, worked for United Airlines during the night shift. *Id.* at 368. But she discovered that working at night aggravated her mental condition, and based on the diagnosis of a psychologist, Gile asked United Airlines to accommodate her condition by reassigning her to the day shift. *Id.* However, the medical director for United Airlines examined Gile and concluded that a reassignment to the day shift would not help her mental condition. *Id.* at 368-70. United Airlines then relied on the medical director's assessment to deny Gile her proposed accommodation. *Id.* A jury imposed punitive damages on United Airlines, but we reversed the award of punitive damages. *Id.* at 376. We ruled that "United's failure to accommodate Gile's disability amounted to negligence because it misunderstood Gile's difficulties, did not regard her condition a disability and neglected to pursue Gile in developing an alternative accommodation." *Id.* at 375-76.

AutoZone, however, understood that Shepherd had a back injury and regarded it as a disability. Thompson, Smith, and Moore did not deny Shepherd an accommodation because they doubted the veracity of Dr. Katchen's medical reports or because they were relying on another doctor's analysis, as United Airlines did in *Gile*. Instead, a rational jury could have concluded that they failed to accommodate Shepherd's disability because they ignored AutoZone's established procedures for handling

accommodation requests. Failing to follow up on an accommodation request might only be negligence if it occurs infrequently, but an employer's response sinks from negligence to reckless indifference when it repeatedly fails to accommodate an employee's disability. *See May v. Chrysler Grp., LLC*, 692 F.3d 734, 746 (7th Cir. 2012). Because Shepherd repeatedly asked Moore for an accommodation, and asked for an accommodation so often that Moore became frustrated by his persistence, a rational jury could have decided that AutoZone's response was not mere negligence, but reckless indifference.

Second, a rational jury could have imputed liability to AutoZone through a manager acting in the scope of employment at AutoZone. We look to general principles of agency law to determine whether managers act within the scope of their employment. *Kolstad*, 527 U.S. at 539-44. To do so, we "consider the kind of authority the employer has given the employee, the amount of discretion given to the employee in executing his job duties, and the manner in which those duties are carried out." *Bruso*, 239 F.3d at 858.

Moore was the lead disability coordinator in AutoZone's benefits department and was responsible for coordinating employees' accommodations. When Smith and Thompson needed to consult a corporate-level officer about how to accommodate Shepherd's disability, they consulted Moore. Additionally, Moore had much discretion in her job; Moore's supervisor, James, was not familiar with Shepherd's case and did not instruct Moore on how to address his disability. Because Moore had

the authority and discretion to make decisions about employees' accommodations, a rational jury could have concluded that Moore was acting in a managerial capacity in the scope of her employment when she authorized accommodations for AutoZone employees. Therefore, a rational jury could have imputed liability to AutoZone based on the evidence presented at trial.

Third, a rational jury could have concluded that AutoZone did not engage in good-faith efforts to enforce an anti-discrimination policy. AutoZone did not introduce a written anti-discrimination policy into evidence, but instead relied on James, AutoZone's benefits manager, to explain AutoZone's procedures for handling disability accommodations in her testimony. Although the employer is not required to present a written or formal anti-discrimination policy, "it is difficult to ascertain the contours of this policy without physical evidence of its existence." *Lampley*, 340 F.3d at 482.

Nor did AutoZone present evidence that an anti-discrimination policy was properly enforced in Shepherd's case. We have held that an employer is unable to establish good-faith efforts when "top management officials" disregard the company's anti-discrimination policy. *Bruso*, 239 F.3d at 860-61; *see also Hertzberg v. SRAM Corp.*, 261 F.3d 651, 663-64 (7th Cir. 2001). Although Thompson and Smith were not "top management officials," Moore was the lead disability coordinator at AutoZone and worked within the upper management of AutoZone's corporate structure. As already discussed, a rational jury could have concluded that Moore exhibited

reckless indifference to Shepherd's federal employment rights, and a rational jury could also have concluded that she disregarded AutoZone's anti-discrimination procedures.

Because a rational jury could have decided all three parts of the *Kolstad* framework in favor of Shepherd, we conclude that the magistrate judge correctly ruled that a rational jury had sufficient evidence to impose punitive damages. We therefore decline to vacate the punitive damages.

### ii.  Due Process

Because we find sufficient evidence for a rational jury to impose punitive damages, we must next consider whether the punitive damages in this case are so grossly excessive that they offend the Due Process Clause of the Fourteenth Amendment. We review a district court's due process analysis of punitive damages de novo. *Grindle*, 665 F.3d at 800; *see also Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 436 (2001).

We analyze the punitive-damages award of $200,000 under the framework the Supreme Court established in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). In *Gore*, the Supreme Court observed that punitive damages "may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition," but punitive damages violate the Due Process Clause "[o]nly when an award can fairly be categorized as 'grossly excessive' in relation to these

interests." *Id.* at 568. The Supreme Court then instructed courts to consider three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *Gore*, 517 U.S. at 575).

The first guidepost requires us to consider the reprehensibility of the defendant's conduct and is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." *Gore*, 517 U.S. at 575. The Supreme Court has elaborated on the proper framework that courts should use to analyze the reprehensibility of the defendant's conduct:

> We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.

*State Farm*, 538 U.S. at 419 (internal citation omitted).

These five factors weigh against AutoZone. First, Shepherd suffered physical—not just economic—harm. Mopping the floors aggravated Shepherd's back condition, and Shepherd suffered severe, and ultimately disabling, pain as a result. Second, AutoZone's conduct demonstrated a reckless disregard for Shepherd's health. AutoZone was aware that Shepherd suffered from a back injury but did not adequately accommodate his disability and required him to mop the floors anyway. Third, Shepherd was financially vulnerable. When Shepherd was asked at trial why he continued to mop the floors even though it caused him pain, he stated he could not afford to lose his job because he had a wife and children. Fourth, AutoZone's dismissiveness of Shepherd's health concerns occurred on multiple occasions and was not an isolated incident. Indeed, Shepherd had contacted Moore so often that she expressed frustration with Shepherd's persistence. The fifth factor considers whether the harm was caused intentionally or accidentally. Shepherd's flare-ups were not the result of a mere accident, but were instead the result of AutoZone's reckless indifference. Therefore, when we consider these factors as a whole, we conclude that AutoZone's conduct was sufficiently reprehensible to justify imposing punitive damages.

The second guidepost requires us to examine the ratio between punitive damages and "the actual harm inflicted on the plaintiff." *Gore*, 517 U.S. at 580. The Supreme Court has repeatedly declined to set a fixed ratio to limit punitive damages based on constitutional

grounds,[2] but it has recognized that in practice, "few awards exceeding a single-digit ratio between punitive and compensatory damages . . . will satisfy due process." *State Farm*, 538 U.S. at 424-25. This approximation is not definitive because "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Id.* at 426.

The jury awarded the EEOC $100,000 in compensatory damages, $500,000 in punitive damages, and $115,000 in back pay. The magistrate judge later remitted the punitive damages to $200,000. This is a two-to-one ratio between punitive and compensatory damages, and if back pay is added to the compensatory damages, the value of the punitive damages is actually less than the value of the back pay and compensatory damages by $15,000. We conclude that these ratios are well within the range of constitutionally acceptable values.

The third guidepost requires us to compare the punitive damages in this case to the "civil or criminal penalties

---

[2]   The Supreme Court established a one-to-one limit on punitive damages in *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008), but that case does not apply to our analysis. The Supreme Court did not decide *Exxon Shipping* on constitutional grounds but instead resolved the issue based on federal maritime common law. *Id.* at 501-02; *see also Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 447 (7th Cir. 2010) (declining to extend the reasoning of *Exxon Shipping* to punitive damages awarded under § 1981a(b)(1)).

that could be imposed for comparable misconduct." *Gore*, 517 U.S. at 583. This allows courts to show "substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." *Id.* (quoting *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 301 (1989) (O'Connor, J., concurring in part and dissenting in part)) (internal quotation marks omitted).

Neither the EEOC nor AutoZone directs us to any comparable civil or criminal fines, but they are instead content to discuss case law that they think is relevant. Thankfully, we need not look far to determine the legislature's judgment concerning the appropriate level of damages in this case: Congress has already defined the statutory cap for the sum of punitive and compensatory damages at $300,000 for this case. § 1981a(b)(3)(D). We recognize that this statutory cap suggests that an award of damages at the capped maximum is not outlandish. *See Lust v. Sealy, Inc.*, 383 F.3d 580, 590-91 (7th Cir. 2004); *see also Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1355 (7th Cir. 1995) (listing cases in which courts have remitted damages to the statutory maximum).

Because all three of the *Gore* guideposts favor the EEOC, we conclude that the punitive-damages award of $200,000 does not violate due process. We therefore decline to further remit the punitive damages.

### 3. Injunction

AutoZone also argues that the magistrate judge's injunction was unwarranted and should be vacated.

District courts have wide discretion "to fashion a complete remedy, which may include injunctive relief, in order to make whole victims of employment discrimination." *EEOC v. Gurnee Inn Corp.*, 914 F.2d 815, 817 (7th Cir. 1990). We therefore review a district court's grant of a permanent injunction for abuse of discretion. *Judge v. Quinn*, 624 F.3d 352, 357 (7th Cir. 2010).

Once a district court finds that an employer has "intentionally engaged in . . . an unlawful employment practice," the court "may enjoin [the employer] from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include . . . equitable relief as the court deems appropriate." 42 U.S.C. § 2000e-5(g)(1); *see also* 42 U.S.C. § 12117(a) (making § 2000e-5(g) applicable to the ADA). To grant an injunction, a court must consider "whether the employer's discriminatory conduct could possibly persist in the future." *Bruso*, 239 F.3d at 864. Because the determinative judgment is about the employer's potential future actions, the EEOC need not prove that the employer previously engaged in widespread discrimination, and "injunctive relief is appropriate even where the [EEOC] has produced no evidence of discrimination going beyond the particular claimant's case." *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1578 (7th Cir. 1997). The burden then falls on the employer to prove that the discrimination is unlikely to continue, and unless the employer can show that the claimant's case is "somehow different from the norm, evidence that would establish a prima facie case for [the claimant] serves the same function for the entire

class of individuals on whose behalf the EEOC seeks relief." *EEOC v. United Parcel Serv.*, 94 F.3d 314, 318 (7th Cir. 1996).

After the jury entered a verdict against AutoZone, the EEOC moved to impose an injunction on AutoZone. The EEOC asked the magistrate judge to impose an injunction that required AutoZone to comply with the reasonable-accommodation provision of the ADA, to adopt a reasonable-accommodation policy and appropriate procedures to implement the policy, to train its management-level employees, to post a notice about AutoZone's violation of the ADA, to keep records of its ADA-related actions, to report these ADA-related actions to the EEOC, and to comply with several other miscellaneous provisions. However, the magistrate judge did not grant the motion in full. Instead, the magistrate judge entered an injunction that only required AutoZone to (1) comply with the reasonable-accommodations requirement of the ADA for employees in the Central District of Illinois; (2) to notify the EEOC of any employee who requests an accommodation during the next three years in the Central District of Illinois; and (3) to maintain complete records of its responses to such accommodation requests. The first requirement was adopted verbatim from the EEOC's motion, but the other two requirements were less intrusive than the EEOC's proposed reporting and record-keeping provisions.

### i. First Provision of the Injunction

AutoZone challenges the first provision of the injunction, which, more specifically, states as follows: "AutoZone

shall make reasonable accommodations to the known physical limitations of any qualified employee with a disability who is working at an AutoZone retail store within the Central District of Illinois and who requests an accommodation or whose need for an accommodation is otherwise known to AutoZone."

Unlike the second and third provisions of the injunction, this provision has no time limit. In essence, the magistrate judge permanently ordered AutoZone to comply with the ADA's accommodation requirement. The order is enforceable via contempt motion, bypassing the normal administrative and adjudicative processes for ADA accommodation claims. AutoZone argues that this part of the judge's order amounts to an impermissible "obey the law" injunction. *See generally NLRB v. Express Publ'g Co.,* 312 U.S. 426, 432-40 (1941); *Swift & Co. v. United States,* 196 U.S. 375, 396 (1905); *SEC v. Smyth,* 420 F.3d 1225, 1233 n.14 (11th Cir. 2005); *cf. Bowles v. Montgomery Ward & Co.,* 143 F.2d 38, 43 (7th Cir. 1944); *Interstate Commerce Comm'n v. Keeshin Motor Express Co.,* 134 F.2d 228, 231 (7th Cir. 1943).

An injunction that does no more than order a defeated litigant to obey the law raises several concerns. One is overbreadth. An obey-the-law injunction departs from the traditional equitable principle that injunctions should prohibit no more than the violation established in the litigation or similar conduct reasonably related to the violation. *See, e.g., Express Publ'g,* 312 U.S. at 433; *Lowery v. Circuit City Stores, Inc.,* 158 F.3d 742, 767 (4th Cir. 1998) (an "obey the law" injunction "impermissibly subjects a

defendant to contempt proceedings for conduct unlike and unrelated to the violation with which it was originally charged"); *Payne v. Travenol Labs., Inc.*, 565 F.2d 895, 897-98 (5th Cir. 1978). Another concern is vagueness. An obey-the-law injunction departs from the traditional equitable principle, codified in Rule 65(d) of the Federal Rules of Civil Procedure, that an injunction must "state its terms specifically[] and . . . describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1); *see, e.g.*, *Schmidt v. Lessard*, 414 U.S. 473, 475-77 (1974) (per curiam); *Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204*, 523 F.3d 668, 675 (7th Cir. 2008); *Patriot Homes, Inc. v. Forest River Hous., Inc.*, 512 F.3d 412, 415 (7th Cir. 2008); *IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 543 (7th Cir. 1998); *City of Mishawaka, Ind. v. Am. Elec. Power Co.*, 616 F.2d 976, 991 (7th Cir. 1980); *Payne*, 565 F.2d at 897-98; *H. K. Porter Co. v. Nat'l Friction Prods. Corp.*, 568 F.2d 24, 27-28 (7th Cir. 1978). These overbreadth and vagueness concerns are rooted in basic principles of due process:

> Because of the risks of contempt proceedings, civil or criminal, paramount interests of liberty and due process make it indispensable for the chancellor or his surrogate to speak clearly, explicitly, and specifically if violation of his direction is to subject a litigant . . . to coercive or penal measures, as well as to payment of damages.

*H. K. Porter*, 568 F.2d at 27.

In the specific context of employment-discrimination actions, the district court has broad statutory authority

to fashion appropriate remedies, including injunctive relief, for proven violations of the anti-discrimination laws. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975) (Title VII confers broad remedial authority on the court to fashion appropriate equitable relief). More specifically, if the court finds that the employer has "intentionally engaged in . . . an unlawful employment practice charged in the complaint, the court may enjoin [the employer] from engaging in *such unlawful employment practice*, and order such affirmative action as may be appropriate [including reinstatement and back pay] . . . , or *any other equitable relief as the court deems appropriate*." 42 U.S.C. § 2000e-5(g)(1) (emphases added). Thus, we have held that "[o]nce employment discrimination has been shown, . . . district judges have broad discretion to issue injunctions addressed to the proven conduct." *Ilona of Hungary*, 108 F.3d at 1578. We have also held that injunctive relief addressed more generally to "the *type* of discrimination proven by a particular plaintiff" does not require "evidence of a pattern or practice of similar conduct," but it *does* require the court to assess whether the proven "discriminatory conduct could possibly persist in the future." *Id.* (emphasis added).

But the court exercises this remedial discretion in accordance with traditional principles of equity, unless the statute directs otherwise. *See eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391-92 (2006). Nothing in § 2000e-5(g)(1) directs otherwise; indeed, the court's remedial authority is specifically keyed to equity. 42 U.S.C. § 2000e-5(g)(1) (The court "*may* enjoin . . . such unlawful employ-

ment practice[] and order . . . any other *equitable relief* as the court deems appropriate." (emphases added)). In practical terms this means that a request for an obey-the-law injunction must be evaluated with great care; this type of injunction will be an "appropriate" form of equitable relief under § 2000e-5(g)(1) only where the evidence suggests that the proven illegal conduct may be resumed. Thus, for example, we have upheld obey-the-law injunctions when the victorious employee remains at the company or has been reinstated; where the particular employees or supervisors responsible for the illegal conduct remain at the company; and/or where the employer has taken some particular action—like withdrawing an accommodation policy—that convinces the court that voluntary compliance with the law will not be forthcoming. *See, e.g.*, *Ilona of Hungary*, 108 F.3d at 1572, 1579 (collecting cases); *Gurnee Inn*, 914 F.2d at 817; *Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194, 1202 (7th Cir. 1971). Often some combination of these factors is present. We have vacated an obey-the-law injunction that was not tailored to the particulars of the case. *See Gaddy v. Abex Corp.*, 884 F.2d 312, 318 (7th Cir. 1989). *Gaddy* involved a discrimination claim premised on disparate distribution of overtime hours; we vacated an injunction generally prohibiting "future retaliation" because it was "too broad" and "impermissibly subject[ed] the defendants to contempt proceedings for conduct 'unlike and unrelated to the violation with which [the defendants were] originally charged.'" *Id.* (alteration in original) (quoting *Express Publ'g*, 312 U.S. at 436)); *see also Sturgill v. UPS, Inc.*, 512 F.3d 1024, 1034-35 (8th Cir. 2008); *Lowery*, 158 F.3d at 767.

Here, the EEOC admitted in its remedial motion that the first provision of its proposed injunction did nothing more than "duplicate the company's existing obligation under law." The magistrate judge, too, acknowledged that this provision merely "require[s] AutoZone to comply with the reasonable accommodation provision of the ADA."

The judge approved this provision in the injunction after upholding the $200,000 award of punitive damages, and much of the punitive-damages analysis also applies here. The magistrate judge found that AutoZone had submitted no written anti-discrimination policy into evidence, and even if such a policy existed, AutoZone presented no evidence that it had enforced such a policy. Furthermore, the judge was shocked at the "reprehensibility" of AutoZone's conduct. Even though at least one corporate officer had been informed about Shepherd's accommodation request, AutoZone nonetheless "insisted for no good reason at all that Shepherd continue to mop." The judge observed that "[t]he requested accommodation was a very simple accommodation: assign the mundane task of mopping to some employee other than Shepherd." But instead of implementing this accommodation, the judge found that AutoZone "chose to threaten Shepherd with his job." The judge declared that this conduct was "total and knowing disregard for the underlying purpose of the ADA."

When analyzing the EEOC's request for an injunction, the court observed that AutoZone had "updated" its ADA compliance policy and employee manual to better

comport with the company's statutory obligation to accommodate employees with disabilities. But the judge did not give this effort much weight, largely because the company dragged its feet for eight years on coming to grips with its ADA obligations. And despite an updated policy and employee manual, the judge still had no evidence showing that AutoZone had enforced its policy.

Although the judge did not explicitly discuss the factors that we have said might support the limited use of an obey-the-law injunction, AutoZone's inaction over eight years was sufficient to convince the judge that compliance with the law will not be forthcoming without an obey-the-law injunction. As the district court emphasized:

> [T]he conduct of the Defendant's managerial employees at the highest level was clearly an intentional violation of the ADA. The evidence showed that these employees knew of Shepherd's back problems, knew that he was under a physician's care for those problems, and knew that the problems were exacerbated by mopping. Despite that knowledge, those managers insisted for no good reason at all that Shepherd continue to mop.

In light of the evidence showing AutoZone's intransigence at quite senior levels of management, we are satisfied that the district court did not abuse its discretion in ordering AutoZone to comply with the ADA's reasonable accommodation requirement in the Central District of Illinois.

Nonetheless, even though the judge limited the geographic reach of the EEOC's proposed obey-the-law

injunction, the order has no temporal limit. It is *permanent*, which would permit any ADA accommodation claim arising at an AutoZone store in the Central District to be raised via contempt motion no matter how remote in time or different from the violation proven in this case. This would indefinitely deny AutoZone the protections of the normal administrative and adjudicative processes in that region. We are satisfied that AutoZone has earned this treatment for at least a reasonable time, or at least that the district court did not abuse its discretion in so finding, but we must remand to the district court with instructions to modify the injunction to impose a reasonable time limit on the first provision requiring compliance with the ADA.

### ii.  Second and Third Provisions of the Injunction

AutoZone further argues that the second and third provisions of the injunction are unwarranted because AutoZone's 2011 employee manual contains an ADA policy against disability discrimination. But a mere policy statement in an employee manual would not have been sufficient to remedy Shepherd's situation. Shepherd's requests for an accommodation were left unresolved because of a systemic failure to properly implement AutoZone's established procedures. AutoZone asserts that the facts of this case cannot justify the injunction because eight years have passed since Shepherd's disabling accident and many of the individuals in this case no longer work for AutoZone, but the passage of time and changes in management personnel do not

guarantee the enforcement of AutoZone's anti-discrimination procedures. By requiring AutoZone to notify the EEOC of employees seeking accommodations and to record its responses to these requests in writing, the injunction ensures that AutoZone will implement the anti-discrimination procedure it purports to follow. Finally, AutoZone asserts that the injunction is too broad because it applies to all stores throughout the Central District of Illinois, but the magistrate judge appropriately crafted the scope of the injunction because AutoZone's problem was not limited to just Shepherd's store.

Overall, the first provision of the injunction should have a reasonable time limit, which the second and third provisions already contain. Therefore, we remand the first provision of the injunction but affirm the second and third provisions.

### 4. Award of Costs

Finally, AutoZone argues that we should reinstate the award of costs to AutoZone that the magistrate judge vacated after the second trial. We review a district court's award of costs for abuse of discretion. *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 864 (7th Cir. 2005).

After the first trial, the magistrate judge entered an award of costs to AutoZone because it was the prevailing party under Federal Rule of Civil Procedure 54(d). But because the second jury reached a verdict in favor of the EEOC and imposed $715,000 in damages on AutoZone

(later remitted to $415,000), the magistrate judge ruled that the EEOC was the new prevailing party. The magistrate judge therefore vacated the prior award of costs. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (defining "prevailing party"); *Republic Tobacco Co. v. N. Atl. Trading Co.*, 481 F.3d 442, 446-47 (7th Cir. 2007).

AutoZone challenges the magistrate judge's decision to vacate the prior order by arguing that the EEOC forfeited any challenge to the magistrate judge's award of costs when the EEOC did not object to the award after the first trial. AutoZone relies upon several cases holding that an issue that was forfeited on an initial appeal cannot be raised on a second appeal. *E.g.*, *United States v. Parker*, 101 F.3d 527, 528 (7th Cir. 1996) ("A party cannot use the accident of a remand to raise in a second appeal an issue that he could just as well have raised in the first appeal because the remand did not affect it."). But this legal principle is not applicable to Shepherd's case. The EEOC did not object to the magistrate judge's initial award of costs because the EEOC was not the prevailing party after the first trial. Instead, the EEOC motioned the magistrate judge to vacate the award of costs at the appropriate time—after the second jury issued its verdict making the EEOC the new prevailing party. The magistrate judge's decision was not an abuse of discretion, but the proper application of Federal Rule of Civil Procedure 54(d). We therefore decline to reinstate the award of costs.

### III. Conclusion

The magistrate judge properly upheld the second jury's verdict. The first trial did not preclude the second jury from reaching its verdict, and we therefore affirm the magistrate judge's ruling denying AutoZone's motion for judgment as a matter of law. We also affirm the magistrate judge's decision to deny AutoZone's motion for a new trial because Dr. Katchen did not need to submit a written report.

Most of the remedies resulting from the second trial remain in place. We uphold the $100,000 award of compensatory damages because it is not excessive when compared to Shepherd's pain and suffering. We also uphold the $200,000 in punitive damages because the jury heard sufficient evidence of AutoZone's reckless indifference to Shepherd's federal employment rights and because the award is not grossly excessive under the Due Process Clause. Furthermore, we uphold the second and third provisions in the injunction because the district court properly used its discretion to create a remedy that addressed AutoZone's short-comings. But we remand the first provision of the injunction for the judge to impose a reasonable time limit on this provision. Finally, we affirm the magistrate judge's decision to vacate his prior award of costs to AutoZone.

We therefore AFFIRM the magistrate judge's rulings, with the exception of the first provision of the injunction, which we REMAND for further proceedings. The entire injunction, including the remanded first provi-

sion, remains in effect pending the district court's decision imposing a time limit for the first provision.