# IN THE SUPREME COURT OF IOWA

No. 19–2137

Submitted December 15, 2021—Filed January 21, 2022

**WILLIAM McGREW** and **ELAINE McGREW,**

Appellants,

vs.

**EROMOSELE OTOADESE** and **NORTHERN IOWA CARDIOVASCULAR AND THORACIC SURGERY CLINIC, P.C.,**

Appellees.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Black Hawk County, Kellyann M. Lekar, Judge.

Plaintiffs seek further review of a court of appeals decision that affirmed a defense verdict in a medical negligence case, contending that the district court erred in excluding expert opinions. **DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

Mansfield, J., delivered the opinion of the court, in which all participating justices joined. Oxley, J., took no part in the consideration or decision of the case.

Martin A. Diaz (argued), Martin Diaz Law Firm, Swisher, for appellants.

Nancy J. Penner (argued), Jennifer E. Rinden, and Vincent S. Geis of Shuttleworth & Ingersoll, Cedar Rapids, for appellees.

**MANSFIELD, Justice.**

### I. Introduction.

A patient suffered a disabling stroke after undergoing surgery to relieve stenosis, or narrowing, of the carotid artery. The patient's family promptly sought a second opinion from a neurologist. He read the CT angiogram as showing a lesser degree of stenosis and opined that the surgery had been unnecessary. He also referred the CT angiogram to a neuroradiologist who likewise interpreted the angiogram as showing a lesser degree of stenosis.

Later, the patient brought a medical malpractice suit against the surgeon. At trial, the patient was allowed to introduce evidence that both the neurologist and the neuroradiologist had read the angiogram as showing a lesser degree of stenosis. However, based on an alleged failure to provide proper pretrial disclosures, other evidence was excluded. Specifically, the neurologist was not permitted to testify that the surgeon fell below the standard of care; the neuroradiologist was not permitted to testify as to how he calculated the lesser degree of stenosis; and certain contemporaneous medical records were either admitted in redacted form or not admitted at all. The jury returned a no-negligence verdict in favor of the surgeon.

On our appellate review, we disagree with the district court's application of the pretrial disclosure requirements of Iowa Code section 668.11 (2016) and Iowa Rule of Civil Procedure 1.500(2). Neither the neurologist nor the neuroradiologist was retained for litigation purposes; to the contrary, they developed their opinions from being involved in patient care. This means no

expert report under rule 1.500(2)(*b*) was required. Both physicians could offer expert opinions subject only to two disclosure requirements. First, if the opinions were not formed as a part of treatment, the witnesses had to be designated under section 668.11. Second, regardless of when the opinions were formed, they needed to be adequately disclosed under rule 1.500(2)(*c*). Both conditions were met here, so the physicians' testimony and contemporaneous medical records should have been admitted.

We also decline the surgeon's invitation to find that the error was harmless. At trial, the parties essentially agreed on the standard of care for when surgery would have been medically indicated. The trial centered instead on the degree of stenosis and other symptoms in the patient, a subject where the parties presented conflicting evidence. Ultimately, we conclude that the district court's erroneous ruling on permissible expert opinions unfairly hampered the patient in presenting his side of his case. Therefore, we reverse and remand for a new trial.

**II. Background Facts and Proceedings.**

**A. Background Facts.** In 2014, William McGrew began experiencing transient foggy vision in one of his eyes.[1] McGrew went to an eye doctor, Dr. Richard Mauer, to seek relief from this problem on July 25, 2014. Upon examination, Dr. Mauer discovered that McGrew had a cataract that could explain his foggy vision. But Dr. Mauer wanted to rule out other possibilities. He

---

[1]The affected eye was a heavily disputed issue at trial. If McGrew was experiencing foggy vision in his *right* eye, that might indicate blockage in the *right* carotid artery.

ordered a bilateral carotid duplex ultrasound that was performed on August 6. The ultrasound showed "mild carotid stenosis," or narrowing of the carotid artery. The ultrasound was generally inconclusive, but according to Dr. Mauer, there was nothing to indicate immediate treatment was necessary. So McGrew and Dr. Mauer scheduled a cataract surgery to be performed on August 20. But McGrew wanted to further explore the possibility that a vascular problem could be causing his foggy vision. To this end, he was referred to Dr. Eromosele Otoadese, a cardiovascular surgeon.

Dr. Otoadese saw McGrew on August 18. Given that McGrew was sixty-nine years old, had a history of hypertension, and was suffering from transient foggy vision, Dr. Otoadese suspected carotid disease and recommended getting a CT angiogram to further investigate. The CT angiogram was done the same day at a local imaging center. A radiologist, Dr. Driss Cammoun, interpreted it as showing 65% stenosis, or narrowing, of the right carotid. Dr. Otoadese did his own review and interpreted the results to show 70% stenosis. This led him to believe McGrew was at a significant risk of a stroke. Dr. Otoadese recommended surgery, specifically a right carotid endarterectomy, to remove the plaque from the right carotid. He advised McGrew of the surgery's potential complications, the most common being a stroke. At Dr. Otoadese's recommendation, McGrew canceled the cataract surgery and scheduled the carotid surgery. McGrew signed the informed consent for the carotid surgery on August 27.

The surgery was performed by Dr. Otoadese on September 2. It initially seemed successful; there were no complications during the procedure or

immediately after. But during the morning of September 3, McGrew experienced facial droop and weakness on his left side. A CAT scan and an MRI indicated that McGrew had suffered a stroke on the right side of his brain. A CT angiogram showed that the right carotid artery was blocked. After consulting with another doctor and discussing the situation with McGrew's family, Dr. Otoadese performed another operation to remove the carotid artery blockage. This second surgery was unsuccessful in alleviating McGrew's symptoms. He remains wheelchair-bound, unable to move his left side, and in need of nursing home care.

On September 26, McGrew and his family went to an appointment with Dr. Ivo Bekavac, a neurologist. Dr. Bekavac was trained to read neuroimaging studies and certified by the Neuroimaging Subspecialty Board. According to Dr. Bekavac, the McGrew family came to him "to get a second opinion and also establish the care." As part of Dr. Bekavac's standard procedure, he reviewed McGrew's file, including the original CT angiogram and corresponding report. Unlike Dr. Otoadese and Dr. Cammoun—who interpreted the CT angiogram to show 70% and 65% stenosis respectively—Dr. Bekavac read it as showing 40%. This was a significant discrepancy, so Dr. Bekavac asked a neuroradiologist, Dr. John Halloran, to analyze the CT angiogram as well. Dr. Halloran assessed the stenosis at 32% in a report dated October 9.[2]

---

[2]Dr. Bekavac and Dr. Halloran also provided other medical services to McGrew, including ordering and reviewing an MRI, relevant to McGrew's postsurgery complaints of back pain.

The McGrew family asked Dr. Bekavac whether he thought the carotid surgery performed by Dr. Otoadese was justified based on those numbers. Dr. Bekavac answered this question in his record of the visit, stating, "40% of stenosis was not significant to justify endarterectomy in my opinion." The family also asked about the second surgery, and Dr. Bekavac's report indicates he did not believe the second surgery was medically indicated, either, because McGrew had suffered his stroke more than eight hours earlier. In addition to offering opinions on the prior surgeries, Dr. Bekavac recommended continued use of aspirin, family involvement in stroke rehabilitation, an MRI of the lumbosacral spine, and a follow-up appointment. Dr. Bekavac did not comment on causation in his notes from this visit.

**B. Proceedings in the District Court.** On July 29, 2016, McGrew and his wife, Elaine McGrew, brought a medical malpractice action against Dr. Otoadese and Dr. Cammoun.[3] The McGrews later settled with Dr. Cammoun, so trial proceeded only against Dr. Otoadese. The McGrews alleged that Dr. Otoadese negligently misinterpreted the CT angiogram and recommended an ill-advised surgery that resulted in a stroke. The McGrews sought damages including pain and suffering, permanent loss of function, loss of income, past and future medical expenses, and loss of consortium.

---

[3]The McGrews also named Dr. Otoadese's practice group, Northern Iowa Cardiovascular and Thoracic Surgery Clinic, P.C., as a defendant based upon the alleged negligence of Dr. Otoadese. The jury was instructed to treat the physician and his practice group as a single party. We shall refer to them collectively as "Dr. Otoadese."

The McGrews filed a designation of experts on February 6, 2018. Four experts were disclosed: two retained experts and two treating physicians. The treating physicians designated as experts were Dr. Bekavac and Dr. Halloran. The designation described the topics of Dr. Bekavac's anticipated testimony:

> Dr. Bekavac . . . will be asked to comment on the standard of care in the evaluation (imaging and surgery), care and treatment of an individual like Bill McGrew; the breach of that standard of care; the harm sustained by Bill McGrew; and the cause-and-effect relationship between the breach of the standard of care and any damages and injuries sustained by Bill McGrew and his spouse.

The disclosure relating to Dr. Halloran was similarly worded, the sole difference being that Dr. Halloran would only be asked about his evaluation of McGrew's imaging studies.

The defense served an interrogatory on the McGrews relating to their experts. The McGrews first answered this interrogatory with a summary of topics that each expert would cover. Later, on March 7, the McGrews provided a "Supplement to Interrogatory 16 Pursuant to IRCP 1.500(2)(c)." The supplemented answer stated that "Dr. Ivo Bekavac[] and Dr. John Halloran may testify pursuant to previously produced medical records and Plaintiff's Designation of Experts." It went on to summarize Dr. Bekavac's medical record: "Dr. Bekavac reviewed the CTA and determined a stenosis of the right ICA of approximately 40%. 40% stenosis is not sufficient to justify endarterectomy. The first and therefore the second endarterectomy were unnecessary and violated the standard of care." The supplemented answer also summarized Dr. Halloran's opinion, stating, "Dr. Halloran, in his medical record dated October 9, 2014, reviewed the CTA and assessed a stenosis of 32%. . . . Dr. Otoadese misread the

CTA and violated the applicable standard of care." Causation was listed as an area of testimony for both doctors, but the McGrews did not attempt to summarize the doctors' opinions on that subject.

Several pretrial motions in limine were filed by both sides, but only two of the defense's motions are relevant on appeal.

First, Dr. Otoadese sought to exclude the "after-the-fact non-treatment opinions of Dr. Bekavac and Dr. Halloran" on topics such as the standard of care or causation. In support of this motion, the defense cited Iowa Rule of Civil Procedure 1.500(2) and *Hansen v. Central Iowa Hospital Corp.*, 686 N.W.2d 476 (Iowa 2004).

Second, Dr. Otoadese moved to prevent the McGrews from presenting evidence on certain aspects of his career history, such as a settlement in which he voluntarily relinquished his hospital privileges to perform open-heart surgery in 2009 and his getting "kicked out" of his former practice group in 2012. Dr. Otoadese argued that such evidence would be substantially more prejudicial than probative and, therefore, should be excluded under Iowa Rule of Evidence 5.403.

At the outset of trial, the court took up some of the motions in limine. On the expert disclosure issue, offers of proof were made by the McGrews for Dr. Bekavac and Dr. Halloran. The court ultimately found that both doctors were properly disclosed as experts pursuant to Iowa Code section 668.11. Also, it found that no rule 1.500(2)(*b*) written report was required from either physician.

But the court, citing *Hansen,* ruled that a treating doctor's testimony must be limited to opinions that were an aspect of providing treatment.

Specifically, the court found that Dr. Halloran's testimony would not be admissible at all because he did not treat McGrew. Dr. Bekavac, on the other hand, would be allowed to testify on a limited basis. The level of stenosis observed by both doctors would be admissible through Dr. Bekavac because those numbers were generated as part of examining McGrew's medical history for treatment purposes. But opinions related to standard of care or causation would be off limits. In explaining this decision, the court pointed to "case law language that a treating physician cannot testify as to standard of care or causation when those issues were not necessary for the physician to formulate an opinion to care for the patient."

Dr. Bekavac's September 26, 2014 medical record was admitted only in redacted form. Thus, the McGrews were able to introduce Dr. Bekavac's statement that in his "opinion stenosis of right ICA [was] approximately 40%." However, they were not allowed to introduce Dr. Bekavac's statement later in the same record that "40% of stenosis was not significant to justify endarterectomy in my opinion."

Dr. Halloran's October 9, 2014 medical record was not admitted at all. That record described Dr. Halloran's review technique and method as well as his conclusion that there was "32% diameter stenosis." Yet Dr. Bekavac's October 30, 2014 medical record was admitted, wherein he reported, "Dr. Halloran did over read CTA and felt there is ICA stenosis of 32%."

Dr. Bekavac's trial testimony related how he reviewed the CT angiogram with the McGrew family and estimated the stenosis, or narrowing, at 40%. Dr. Bekavac added that this was "a significant difference" from a 65% or 70% stenosis. In light of the discrepancy, Dr. Bekavac testified that he asked Dr. Halloran for an "over reading." Dr. Halloran, he explained, "has special qualifications in neuroimaging" and "software which can more accurately measure degree of narrowing." According to Dr. Bekavac, Dr. Halloran reported 32% stenosis.

Later in the trial, the court also made rulings regarding Dr. Otoadese's career history. The court allowed cross-examination regarding Dr. Otoadese's background but forbid references to his getting "kicked out" of a medical group, losing open-heart surgery admitting privileges, and the like.

Both sides called retained experts at trial. Dr. Carl Adams, a cardiovascular surgeon, testified for the McGrews. According to Dr. Adams, McGrew's right carotid stenosis appeared to be in the range of 30% to 45%. Dr. Adams opined that given this range, regardless of whether McGrew's vision problems had been on the left or the right side, McGrew was not a candidate for surgery.

Dr. James Levett, a cardiovascular surgeon, and Dr. James Gebel, a neurologist, attempted to counter that testimony on behalf of Dr. Otoadese. Dr. Levett testified that McGrew met the indications for carotid artery surgery in light of his symptoms and 65% to 70% blockage. Dr. Gebel testified that based

on his review of the imaging available to Dr. Otoadese, he came up with a 60% to 65% stenosis number, "approximately" the same figure as Dr. Cammoun.

On March 7, the jury returned a defense verdict finding that Dr. Otoadese was not negligent. The McGrews moved for a new trial. In denying the motion, the district court elaborated on its decision not to allow standard of care or causation opinions from Dr. Bekavac and Dr. Halloran:

> I agree Halloran and Bekavac were both listed in the 668.11 designation, . . . *Hansen* stands for the fact that even . . . designated as a 668.11 expert, the ability of a treating physician to testify with regard to standard of care hinges on that aspect of whether or not that standard of care and other opinions sought from that expert or sought from that treating physician . . . were necessary to be formulated as part of that treating physician's care of the patient, as opposed to formulated in response to the issues presented by the litigation.

The court later added that even if it had erred in these rulings, the McGrews were not prejudiced "in light of the testimony that was permitted through Dr. Bekavac and the accompanying exhibits, as well as the testimony of the Plaintiffs' retained expert."

The McGrews filed a timely appeal, and we transferred the case to the court of appeals.

**C. The Court of Appeals Decision.** On March 3, 2021, the court of appeals affirmed the judgment in favor of the defendants. On the expert witness issue, the court found that Dr. Bekavac and Dr. Halloran took on a role "analogous to that of a retained expert" and, therefore, disclosure of their opinions was required pursuant to rule 1.500(2)(*c*). *See Eisenhauer ex rel. T.D. v. Henry Cnty. Health Ctr.*, 935 N.W.2d 1, 22 (Iowa 2019). Specifically, the court of

appeals held that under rule 1.500(2)(*c*), the McGrews had to disclose "[a] summary of the facts and opinions to which the witness[es] [were] expected to testify." The court of appeals held that this information was not sufficiently disclosed, stating, "The exact nature of the doctors' opinions was unknown to the parties."

Regarding Dr. Otoadese's career history, the court of appeals found that the district court had not abused its discretion in its rule 5.403 calculus:

> There was no need for the evidence; there was no clear proof of exactly what occurred leading to the settlement agreements between Dr. Otoadese and the hospital and medical clinic. The evidence gave weak support to the proposition that Dr. Otoadese was negligent.

> In addition, even if the evidence had some relevance, any probative value would be outweighed by the danger the evidence is unduly prejudicial. The evidence would improperly influence the jury to find Dr. Otoadese liable based on evidence involving different events. We conclude the district court did not abuse its discretion in finding the evidence was inadmissible.

(Citations omitted.)

The McGrews applied for further review, and we granted their application. "On further review, we have the discretion to review all or some of the issues raised on appeal or in the application for further review." *Wermerskirchen v. Canadian Nat'l R.R.*, 955 N.W.2d 822, 827 (Iowa 2021) (quoting *State v. Roby*, 951 N.W.2d 459, 463 (Iowa 2020)). The McGrews applied for further review only on the expert disclosure issue and we choose to review only that issue. The court of appeals decision shall stand as the final decision on whether the district court abused its discretion in curtailing the evidence of Dr. Otoadese's career history that could be presented at trial.

**III. Standard of Review.**

"We review whether a district court properly admitted expert testimony for abuse of discretion." *Eisenhauer ex rel. T.D.*, 935 N.W.2d at 9. But when we review the interpretation of a rule of civil procedure, such as rule 1.500(2), our review is for errors at law. *Jack v. P & A Farms, Ltd.*, 822 N.W.2d 511, 515 (Iowa 2012) ("[W]e review the interpretation of our rules of civil procedure for correction of errors at law.").

**IV. Analysis.**

This case highlights the importance of distinguishing among three separate disclosure obligations: (1) the expert designation requirement of Iowa Code section 668.11, (2) the expert report requirement of rule 1.500(2)(*b*), and the expert disclosure requirement of rule 1.500(2)(*c*).

**A. Iowa Code Section 668.11.** Iowa Code section 668.11 governs the "[d]isclosure of expert witnesses in liability cases involving licensed professionals." It provides,

> A party in a professional liability case brought against a licensed professional pursuant to this chapter who intends to call an expert witness of their own selection, shall certify to the court and all other parties the expert's name, qualifications and the purpose for calling the expert . . . .

Iowa Code § 668.11(1).

In *Hansen*, we decided that treating physicians may testify on causation without being designated as experts under Iowa Code section 668.11 if their causation opinion was developed in the course of treatment. 686 N.W.2d at 482–84. The plaintiff in *Hansen* alleged that she suffered severe back pain as a result

of a fall caused by a hospital's negligence. *Id.* at 478. The plaintiff disclosed that she intended to have her treating doctor testify at trial regarding her "medical condition, as well as causation and damage issues." *Id.* But she did not designate the treating doctor as an expert witness under Iowa Code section 668.11. *Id.* at 479.

The district court decided not to allow the treating doctor to testify on the causation issue because it understood that only designated experts could provide an opinion on causation. *Id.* This decision was likely based on *Cox v. Jones,* 470 N.W.2d 23, 25 (Iowa 1991). *Cox,* as pointed out in *Hansen,* "held that a treating physician must be designated as an expert pursuant to section 668.11 if the physician is to give opinions on reasonable standards of care and *causation.*" 686 N.W.2d at 480.

But on appeal in *Hansen,* we decided not to adhere to the *Cox* language regarding causation because it was dictum; the element of causation was not even at issue in that case. *Id.* at 482. Instead, we looked to our more recent holding in *Carson v. Webb,* 486 N.W.2d 278 (Iowa 1992). *Hansen,* 686 N.W.2d at 482–83. In *Carson,* we explained that "the paramount criterion" when considering the need for Iowa Code section 668.11 disclosure from treating physicians "is whether th[e] evidence, irrespective of whether technically expert opinion testimony, relates to facts and opinions arrived at by a physician in treating a patient or whether it represents expert opinion testimony formulated for purposes of issues in pending or anticipated litigation." 486 N.W.2d at 281.

As we applied this rule in *Hansen*, we found that the treating doctor had "formed his causation opinion as a *treater*." 686 N.W.2d at 484. In support of this finding, we noted that the doctor had been treating the defendant long before the fall that led to the lawsuit. *Id.* Also, he treated the defendant for increased pain after the fall occurred. *Id.* As the doctor stated at his deposition, "The time sequence suggests that there was some correlation between the events that occurred and her subsequent increased pain." *Id.* Because the doctor developed his causation opinion via treatment of the defendant, it did not matter that the plaintiff had not made a section 668.11 expert designation. *Id.*

*Hansen* thus draws a line between opinions formed during treatment, which do not trigger an obligation to make an Iowa Code section 668.11 disclosure, and opinions formed during or in anticipation of litigation, which do. *Hansen* does not hold that treating physicians are barred from testifying to causation opinions they form outside of treatment. The physician simply has to be disclosed pursuant to section 668.11. Here, there is no question that the McGrews timely designated Dr. Bekavac and Dr. Halloran pursuant to section 668.11. There is no section 668.11 issue.

**B. Rule 1.500(2)(*b*).** Ten years after *Hansen*, in 2014, a series of amendments to the Iowa Rules of Civil Procedure went into effect. These included rule 1.500(2), which requires the "[d]isclosure of expert testimony." Iowa R. Civ. Pro. 1.500(2). Subsection (*a*) states that "a party must disclose to the other parties the identity of any witness the party may use at trial to present evidence under Iowa Rules of Evidence 5.702, 5.703, and 5.705." *Id.* r. 1.500(2)(*a*).

Notably, this portion of the rule covers all expert testimony, regardless of the basis for the expert opinion.

The next subsection, subsection (*b*), requires certain expert witnesses to provide a signed written report. *Id.* r. 1.500(2)(*b*). This requirement only applies "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." *Id.* If a written report is required, it must contain:

(1) A complete statement of all opinions the witness will express and the basis and reasons for them.

(2) The facts or data considered by the witness in forming the opinions.

(3) Any exhibits that will be used to summarize or support the opinions.

(4) The witness's qualifications, including a list of all publications authored in the previous ten years.

(5) A list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition.

(6) A statement of the compensation to be paid for the study and testimony in the case.

*Id.*

If an expert witness is not required to submit a written report, the party must still provide a disclosure pursuant to subsection (*c*). *Id.* r. 1.500(2)(*c*). This disclosure is less comprehensive than a written report. It only needs to (1) state "[t]he subject matter on which the witness is expected to present evidence under Iowa Rules of Evidence 5.702, 5.703, or 5.705" and (2) provide "[a] summary of the facts and opinions to which the witness is expected to testify." *Id.*

Dr. Otoadese argues that rule 1.500(2)(*b*) applied here and written reports were required from both Dr. Bekavac and Dr. Halloran. He reasons that when a treating physician intends to offer opinions that were not formulated during treatment, that physician takes on the role of a retained expert and must disclose their opinions accordingly. Dr. Otoadese analogizes the circumstances when expert reports are required under rule 1.500(2)(*b*) to the circumstances when interrogatory answers can be obtained under rule 1.508.

In *Day v. McIlrath*, we addressed the latter issue. 469 N.W.2d 676, 677 (Iowa 1991) (per curiam). *Day* held that the opinions of a treating physician were not discoverable through rule 1.508 interrogatories because they were not developed in anticipation of litigation or trial. *Id.* We explained, "A treating physician ordinarily learns facts in a case, and forms mental impressions or opinions, substantially before he or she is retained as an expert witness, and often before the parties themselves anticipate litigation." *Id.* At the end of the opinion, though, we added a cautionary note: "When a treating physician assumes a role in litigation analogous to the role of a retained expert, supplemental discovery under rule [1.508] could become obligatory." *Id. Day* thus draws a line similar to the one drawn in *Hansen*—between opinions formed during treatment and opinions formed during or in anticipation of litigation.

Rule 1.508, entitled "Discovery of experts," applies when the opinions have been "acquired or developed in anticipation of litigation or for trial." Iowa R. Civ. Pro. 1.508(1). But rule 1.500(2)(*b*) is narrower in scope: it requires a written report only "if the witness is one retained or specially employed to provide expert

testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Rule 1.508 focuses on the source of the opinion. By contrast, rule 1.500(2)(*b*) focuses on the status of the expert—were they actually retained for litigation purposes?

Although we adopted rule 1.500 in one fell swoop in 2014, Federal Rule of Civil Procedure 26(a)(2) took its final form in two stages. The expert report requirement in Rule 26(a)(2)(B) came along first, in 1993, and the less-stringent expert disclosure requirement in Rule 26(a)(2)(C) came along second, in 2010. *See* 8A Charles Alan Wright et al., *Federal Practice and Procedure* § 2031.2 (3d ed. 2010). The Advisory Committee Notes discussing the 2010 amendment explain that some post-1993 federal courts had been too zealous in requiring expert reports and that such a report should be required only from "an expert described in" the rule, i.e., someone specially retained to provide expert testimony:

> Rule 26(a)(2)(C) is added to mandate summary disclosures of the opinions to be offered by expert witnesses who are not required to provide reports under Rule 26(a)(2)(B) and of the facts supporting those opinions. This disclosure is considerably less extensive than the report required by Rule 26(a)(2)(B). Courts must take care against requiring undue detail, keeping in mind that these witnesses have not been specially retained and may not be as responsive to counsel as those who have.
>
> This amendment resolves a tension that has sometimes prompted courts to require reports under Rule 26(a)(2)(B) even from witnesses exempted from the report requirement. An (a)(2)(B) report is required only from an expert described in (a)(2)(B).

Fed. R. Civ. P. 26(a)(2)(C) advisory committee's note to 2010 amendment.

One federal district court cogently analyzed the pre-2010 tension and how it was resolved by the 2010 amendment:

> Before the 2010 amendments, there were vast differences in the disclosure requirements that applied to retained and non-retained experts: whereas retained experts had to disclose *full* expert reports, non-retained experts didn't have to disclose *anything.* Because of this disparity, courts understandably felt a strong impulse, whenever the call was close, to classify the expert as retained and to require disclosure. This was necessary, many courts believed, to give the other side adequate notice of the physician's testimony. But, in the 2010 amendments, Congress added Section (C) to Rule 26(a)(2)—which, as we've seen, requires non-retained experts to submit written summaries. *See* Fed. R. Civ. P. 26(a)(2)(C) (requiring non-retained experts to supply "a summary of the facts and opinions to which the witness is expected to testify"); Fed. R. Civ. P. 26 advisory committee's notes to 2010 amendment (noting that non-retained expert must also provide "the facts supporting [the expert's] opinions"). Under *this* framework, then, there's little reason to fear that the other side—here, the defense—will be surprised by an expert whose testimony it never had the chance to (fully) examine. In this respect, the committee's notes make clear that the "amendment resolves a tension that has sometimes prompted courts to require reports under Rule 26(a)(2)(B) even from witnesses exempted from the report requirement." Fed. R. Civ. P. 26 advisory committee's notes to 2010 amendment.

*Torres v. Wal-Mart Stores E., L.P.*, ___ F. Supp.3d ___, ___, 2021 WL 3634632, at *13 (S.D. Fla. August 17, 2021) (alteration in original) (footnote omitted). This district court added, "We aren't alone in questioning the wisdom of relying on pre-2010 cases to confine non-retained physicians to the opinions they formed during treatment." *Id.* at *15 (discussing other federal cases).[4]

---

[4]Indeed, the *Torres* court is not alone; many courts have recently allowed nontreatment opinions to be disclosed under the less onerous requirements of Federal Rule 26(a)(2)(C). *See, e.g., SB Holdings I, LLC v. Ind. Harbor Ins.*, No. 20–14729, 2021 WL 3825166, at *3 n.6 (11th Cir. 2021) (per curiam) (noting that "certain types of individuals, such as treating physicians, . . . are exempt from the disclosure requirements for retained experts because their testimony primarily concerns personal observations made during the course of rendering their professional services"); *Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 702–03 (8th Cir. 2018) (considering whether the plaintiff adequately disclosed a nonretained treating doctor's expected

A leading treatise pointedly criticizes the practice of requiring expert reports from treating physicians who have not been actually retained to offer additional opinions: "The amended Rule focuses exclusively on whether the expert was retained, not the nature of the activity that the expert engaged in to form conclusions . . . ." David H. Kaye et al., *The New Wigmore: A Treatise on Evidence: Expert Evidence* § 4.2.2(b), at 181 (3d ed. 2021). "The language of the old Rule should have made it clear that treating physicians and other percipient-witness experts not formally retained by a party do not generally need to provide written reports—indeed, the advisory committee notes made that explicit. Now, the amendments have made it clearer." *Id.* at 179 (footnote omitted).

Admittedly, despite the 2010 amendment, some federal courts continue to impose expert report requirements on treating physicians based on the timing or subject matter of their opinions rather than their status as having been "retained." *See, e.g.*, *United States v. Williams*, No. 20–10433, 2021 WL 2819016, at *3 (5th Cir. July 6, 2021) ("Although a party's treating physicians typically do not need to disclose a written expert report before testifying, some courts have

---

testimony under the lesser requirements of Rule 26(a)(2)(C) rather than requiring a written report); *Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 704 (7th Cir. 2015) (indicating that the plaintiff's treating physician could serve as a causation expert without providing an expert report if his opinions had been disclosed under Federal Rule 26(a)(2)(C)); *D'Attore v. Salmon*, 572 F. App'x 17, 18 n.1 (2d Cir. 2014) ("The plain language of Federal Rule of Civil Procedure 26—amended in 2010—does not require a report for treating physicians, because they are not 'retained or specially employed to provide expert testimony.'" (quoting Fed. R. Civ. P. 26(a)(2))); *Morrison v. Wal-Mart Stores, Inc.*, 321 F.R.D. 336, 338–39 (C.D. Ill. 2017) ("Dr. Mulconrey is not a retained expert. Accordingly, under the plain language of the Rule, the expert falls within the disclosure requirements of subsection (a)(2)(A) and (a)(2)(C), but not the reporting requirements of subsection (a)(2)(B)."); *Williams v. Devlin*, 100 F. Supp. 3d 8, 12 (D.D.C. 2015) (finding that pre-2010 cases were "inapposite" and that a written report was not required for a nonretained treating physician).

held that this exception does not apply to 'opinions that the treating physician arrives at after treatment, for the purposes of litigation.' We need not decide this question, which remains unsettled in this circuit." (citation omitted) (quoting *LaShip, LLC v. Hayward Baker, Inc.*, 296 F.R.D. 475, 480 (E.D. La. 2013))); *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 833 (9th Cir. 2013) (citing a pre-2010-amendment case and stating that treating physicians who do not provide a report may only give opinions "formed during the course of the physician's treatment[] and not in preparation for litigation"). Perhaps this is because some of the federal judges authoring these decisions left practice before 2010. Regardless, we think the plain language of rule 1.500(2)(*b*) should dictate the outcome in Iowa. Dr. Bekavac and Dr. Halloran were not retained experts; they were consulted for medical purposes, not litigation purposes. Therefore, the McGrews were not required to provide written reports for them under rule 1.500(2)(*b*).

**C. Rule 1.500(2)(*c*).** Even if an expert witness is not required to submit a written report, the party must still provide a disclosure pursuant to rule 1.500(2)(*c*). Iowa R. Civ. Pro. 1.500(2)(*c*). This disclosure must (1) state "[t]he subject matter on which the witness is expected to present evidence under Iowa Rules of Evidence 5.702, 5.703, or 5.705" and (2) provide "[a] summary of the facts and opinions to which the witness is expected to testify." *Id.*

For Drs. Bekavac and Halloran, rule 1.500(2)(*c*) disclosures were required in lieu of a written report. Dr. Otoadese argues that the McGrews' disclosures were insufficient under rule 1.500(2)(*c*). He says the McGrews' interrogatory

answer and the doctors' records disclosed the subject matter of the expected testimony and a "medical disagreement" but did not set forth an actual opinion (or summary thereof) on standard of care or causation. He posits that "extrapolation and speculation would be required" to arrive at actual opinions on those topics.

The McGrews have a different understanding of rule 1.500(2)(*c*)'s requirements and insist that their disclosure was sufficient. The McGrews also point out that the defendants had an opportunity to depose Dr. Bekavac and Dr. Halloran before trial and declined to do so.

We provided guidance on the requirements of section 1.500(2)(*c*) in *Eisenhauer ex rel. T.D. v. Henry County Health Center*, 935 N.W.2d 1. In *Eisenhauer*, a baby's left shoulder become stuck during birth and the delivery team performed an emergency "McRoberts maneuver" to free the child from the birth canal. *Id.* at 7–8. After the baby was born with permanent damage to his left arm, a conservator brought a claim for medical negligence. *Id.* at 8. During direct testimony at trial, the treating physician-defendant, Dr. Widmer, was asked his opinion on whether he conformed with the standard of care, to which he responded, "I believe I did." *Id.* at 20. We held that this four-word opinion was admissible because there had been adequate pretrial disclosure under rule 1.500(2)(*c*). *Id.* at 21–22.

The defendants in *Eisenhauer* had made a timely designation of Dr. Widmer as an expert under Iowa Code section 668.11. *Id.* at 20. Additionally, they had provided an expert disclosure under rule 1.500(2)(*c*) that stated, "*The*

*purpose of calling Dr. Widmer will be to have him testify on the issues of standard of care, causation and damages.* Dr. Widmer is expected to testify at trial consistent with his deposition testimony given in this case." *Id.* at 20. We determined that this statement satisfied the defendants' obligation under rule 1.500(2)(*c*)(1) to disclose the subject matter of Dr. Widmer's expert testimony. *Id.* We also held that Dr. Widmer's actual deposition testimony, which the pretrial disclosure had incorporated by reference, met rule 1.500(2)(*c*)(2)'s requirement to disclose a summary of the facts and opinions to which the physician was expected to testify. *Id.* at 21. Our opinion quoted liberally from Dr. Widmer's deposition testimony that the McRoberts maneuver was performed "satisfactorily," that the maneuver was "successful," that it was "properly executed," and that the baby was delivered within the time frame that was needed. *Id.* Dr. Widmer's trial testimony was, if anything, "decidedly less detailed than his responses from the deposition testimony." *Id.* at 22. Providing that deposition testimony was enough to satisfy the disclosure requirements. Notably, we did not require any particular form of disclosure or the use of any magic words, i.e., "The standard of care is *x*."

The advisory committee's notes to Federal Rule 26(a)(2)(C), quoted above, are in line with our flexible construction in *Eisenhauer*. They explain that the rule was designed to mandate much less disclosure than is required for a signed written expert report and should not be interpreted too restrictively.

Although the summary of facts and opinions under rule 1.500(2)(*c*)(2) does not require a high level of specificity, clearly there must be some summary of the

actual facts and opinions to which the witness is expected to testify. A mere list of topics or subject areas does not meet the requirements of the rule. Significantly, in *Eisenhauer*, it was Dr. Widmer's prior deposition testimony—and its incorporation into the disclosure—that made the defendants' disclosure adequate for rule 1.500(2)(*c*) purposes. *See* 935 N.W.2d at 21–22.

**D. The Adequacy of the Rule 1.500(2)(*c*) Disclosures in This Case.**
Upon review of the record, we find that the McGrews properly disclosed both Dr. Bekavac's and Dr. Halloran's opinions on the standard of care, but they failed to adequately disclose either doctor's opinion on causation. The McGrews' supplemental interrogatory answer stated that "Dr. Bekavac reviewed the CTA and determined a stenosis of the right ICA of approximately 40%. 40% stenosis is not sufficient to justify endarterectomy. The first and therefore the second endarterectomy were unnecessary and violated the standard of care." For Dr. Halloran's opinion, the answer summarized simply, "Dr. Otoadese misread the CTA and violated the applicable standard of care."

The interrogatory answer went on to reference the physicians' own medical records. Dr. Bekavac had written in his record that "40% of stenosis was not significant to justify endarterectomy in my opinion." Dr. Halloran wrote in his record that he measured "a 32% diameter stenosis." While these summaries are not detailed, it is clear that Dr. Bekavac believed surgery was unnecessary, and that both doctors believed the CT angiogram had been misread. Some factual bases were given for these opinions. Therefore, both Dr. Bekavac and Dr. Halloran could testify on the applicable standard of care to the foregoing

extent. The district court abused its discretion when it did not allow them to do so.

The district court also abused its discretion in preventing the McGrews from introducing complete versions of the contemporaneous medical records. It is undisputed that those records, which contained certain opinions and the grounds for them, had been timely disclosed in full. It seems incongruous to us to redact those same records (or in the case of Dr. Halloran, exclude them altogether) on the asserted ground of nondisclosure.

On the other hand, no causation opinion was disclosed for either physician in the medical records or otherwise. While Dr. Bekavac's notes seem to assume the September 2, 2014 surgery caused the stroke—something that was largely assumed at trial as well—this is not actually stated. Nor did the McGrews attempt to summarize a causation opinion in their interrogatory answer. Consequently, no causation opinion was disclosed and the district court did not abuse its discretion when it disallowed testimony on causation.

**E. Harmless Error.** Next we must decide whether the district court's abuse of discretion prejudiced the McGrews. Reversal of the district court is only required if the McGrews' substantial rights were affected. *See Eisenhauer*, 935 N.W.2d at 19; *see also Tappe ex rel. Tappe v. Iowa Methodist Med. Ctr.*, 477 N.W.2d 396, 401 (Iowa 1991) (finding reversal was not justified in a medical malpractice case because the district court's wrongful exclusion of expert testimony was harmless). "We presume prejudice and reverse unless the record

affirmatively establishes otherwise." *Eisenhauer*, 935 N.W.2d at 19 (quoting *State v. Russell*, 893 N.W.2d 307, 314 (Iowa 2017)).

This is a close call. The case came down to the degree of stenosis. Everyone agreed that a patient with 40% or 32% stenosis was not a candidate for surgery. The defendant himself, Dr. Otoadese, admitted that surgery would be inappropriate if Dr. Bekavac's and Dr. Halloran's stenosis numbers were correct:

> Q. I want you to assume for the sake of our discussion that they're correct. If they are correct, either 32 or 40 percent, under those circumstances, would Mr. McGrew have been a candidate for surgery?
>
> A. No.

Meanwhile, the McGrews' expert, Dr. Adams, conceded that he would have offered surgery had there been 60% to 70% stenosis in combination with a symptom.

The closing arguments at trial further confirm the parties' consensus on who would and who wouldn't be a candidate for surgery. The McGrews' attorney put it this way in closing argument:

> Dr. Otoadese told you that if Drs. Bekavac and Halloran are correct, that it's either 32 or 40 percent, this gentleman was not a candidate for surgery. He told you that. He admitted to you as part of our case, and so if you find that, then the answer to the first question on the verdict form is, yes, he was negligent for putting him through the surgery.

Dr. Otoadese's attorney conceded that her client had given this testimony. But she sought to place the responsibility on the "empty chair," Dr. Cammoun, the radiologist who had previously settled. A leading theme of her closing

argument was that Dr. Otoadese had reasonably relied on the 65% number from Dr. Cammoun:

> I would submit to you that the question to Dr. Otoadese when Mr. Diaz called him on Friday, would you have operated at 40 or 32 percent? Dr. Otoadese very candidly said no. No. That's not the issue here. That wasn't the question or decision he was deciding. He was relying on a report he had a reason to rely on. He had ordered the test, and his own view of Dr. Cammoun's imaging, 65 to 70 percent. That was the information supporting the recommendation and decision.

In short, the fighting issue on standard of care was not over the conditions that would justify endarterectomy. It was over whether McGrew *had* those conditions on September 2, 2014—or at least whether Dr. Otoadese had reasonably relied on others to conclude that he had them.

We have found that the district court erred in refusing to admit Dr. Bekavac's and Dr. Halloran's complete medical records from the fall of 2014, Dr. Bekavac's testimony on standard of care, and Dr. Halloran's testimony on the degree of stenosis. These opinions were set forth in contemporaneous medical records that had been disclosed to the other side; no one retained either doctor to provide these opinions. Still, Dr. Bekavac was permitted to explain his 40% estimate to the jury in detail. He also told the jury about Dr. Halloran's 32% estimate and added that Dr. Halloran could utilize computer software to derive an estimate, a "more accurate way of measuring."

Also, Dr. Bekavac's views on whether the surgery should have occurred probably filtered through to the jury. When asked about the 30% discrepancy between his estimate of stenosis and Dr. Otoadese's, Dr. Bekavac testified it was "a significant difference."

In the end, though, we cannot find harmless error. We draw, in part, on our review of the closing arguments. They are often a barometer of how the case was tried and whether the presence or absence of certain evidence mattered. *See, e.g., State v. Skahill,* 966 N.W.2d 1, 17 (Iowa 2021) (concluding that the admission of a video was not harmless error in part because the video "featured prominently in the State's closing argument"). In her closing, Dr. Otoadese's attorney capitalized on the lack of standard of care testimony coming from anyone on the plaintiffs' side other than their hired gun, Dr. Adams. As Dr. Otoadese's attorney put it, "Dr. Adams is the source of the claims in this case. You've heard a lot about Dr. Bekavac, but in fairness, folks, the criticisms of Dr. Otoadese don't come from Dr. Bekavac. They come from Dr. Adams."

Furthermore, Dr. Bekavac was a friend of Dr. Otoadese. This was acknowledged by both Dr. Bekavac and Dr. Otoadese. Thus, if the McGrews had been able to point to Dr. Bekavac's direct, real-time criticisms of his friend Dr. Otoadese in the medical record, i.e., "40% of stenosis was not significant to justify endarterectomy in my opinion," that might have been compelling.

In addition, Dr. Otoadese's attorney took advantage of the absence of Dr. Halloran, stating, "[A]ll you've heard about Dr. Halloran is a number, 32 percent."[5] If Dr. Halloran had been able to testify, and if his October 9, 2014 medical record had been introduced, there would have been much more than a number. To our untrained judicial eye, the medical record is convincing in its

---

[5]Dr. Otoadese's attorney went on, "Halloran told him 32 percent. We really don't have that much detail about that, but we do have detail from Dr. Cammoun and Dr. Gebel and Dr. Otoadese who have explained it. That's what the evidence has been in this case."

detail and professionalism, and Dr. Halloran, a specialist, would have been able to explain in full how he arrived at the 32% number. Dr. Halloran also would have been able to testify that he came up with the 32% number unaware of anyone else's calculation (or even that McGrew had already had surgery). Dr. Bekavac's secondhand summaries of Dr. Halloran's qualifications and equipment seem to us an inadequate substitute for Dr. Halloran's live testimony on these subjects.

Accordingly, we are not convinced the error was harmless and we reverse and remand for a new trial.

**V. Conclusion.**

For the foregoing reasons, we reverse the judgment of the district court and remand the case for a new trial. The decision of the court of appeals is affirmed in part and vacated in part.

**DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

All justices concur except Oxley, J., who takes no part.